

FILED

FEB 01 2011

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

CITYVIEW AT RIVERWALK, LLC and )
FOCUS DEVELOPMENT, INC. )
                                                        )    Civil Action No. 3:11-CV-50
          Plaintiffs, )    Varlan/Guyton
v. )
)
KNOXVILLE COMMUNITY )
DEVELOPMENT CORPORATION and )
THE CITY OF KNOXVILLE, TENNESSEE )
)
          Defendants. )

## COMPLAINT

Plaintiffs, CITYVIEW AT RIVERWALK, LLC ("Cityview") and FOCUS DEVELOPMENT, INC. ("Focus" and, collectively "Plaintiffs"), by and through their undersigned counsel bring this action against Defendants KNOXVILLE COMMUNITY DEVELOPMENT CORPORATION ("KCDC") and THE CITY OF KNOXVILLE, TENNESSEE ((the "CITY") and, collectively "Defendants") and allege the following:

### PARTIES

1.     Cityview is a Georgia limited liability company.

2.     Focus is a Georgia corporation with its principal place of business in Georgia.

3.     Defendant KCDC is a housing and redevelopment authority of the City of Knoxville, Tennessee organized under the Tennessee Housing Authority Law with its principal place of business located at 901 Broadway North, Knoxville, Tennessee, 37917.

4.     Defendant, the City of Knoxville, Tennessee and all of its departments, divisions, agencies, courts, boards, and instrumentalities (collectively, the "City"), is a municipal

corporation established and existing under the laws of the State of Tennessee, and it may be served through its Mayor at the City-County Building, Knoxville, Tennessee.

5. The City and all of its departments, divisions, agencies, courts, boards and instrumentalities are subject to suit for breach of contract under Tennessee law. Tenn. Code. Ann. § 29-20-205.

## VENUE AND JURISDICTION

6. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds $75,000.00.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as KCDC and the City reside in this district.

## ALLEGATIONS OF FACT

**A. Development and Financing Agreement**

8. As part of a redevelopment effort, the City approved the Old Knoxville Glove Factory Redevelopment and Urban Renewal Plan (the "Plan") pursuant to Resolution No. R-10-06 of the Council of the City of Knoxville.

9. The City approved certain tax increment financing ("TIF") pursuant to Resolution No. R-06-3-901 of the County Commission of Knox County, Tennessee to finance the Plan.

10. In order to effectuate the redevelopment contemplated by the Plan, KCDC entered into a Development and Financing Agreement (the "TIF Agreement") dated September 21, 2006, with Cityview, as Developer. A true and correct copy of the TIF Agreement is attached as Exhibit 1.

11. KCDC executed a promissory note in the principal amount of two million eight hundred thousand dollars ($2,800,000.00) (the "Note") in favor of BB&T, the lender, to finance

-2-

Case 3:11-cv-00050 Document 1 Filed 02/01/11 Page 2 of 20 PageID #: 2

the costs of: (i) acquiring four parcels in Knoxville (the "Property"); (ii) re-conveying the Property; (iii) developing and constructing the Property; and (iv) financing certain other costs associated with the TIF.

12.     Pursuant to the TIF Agreement, the TIF loan or any interest accruing thereon was "to be paid solely out of the Tax Increment Revenues committed by the City and the County to KCDC from the Cityview Project and any GFLH Project(s), which KCDC will pledge to secure such repayment . . ." Exhibit 1, § 6(d).

### B.     Performance Bond Requirement Under The TIF Agreement

13.     The TIF Agreement obligated Cityview to obtain one or more Performance, Labor and Materials Payment Bonds ("Performance Bonds"). Specifically, Section 11(j)(i) of the TIF Agreement required Cityview to provide KCDC "executed originals of performance and labor and materials payment bonds with regard to the construction contract for the City Improvement Plan, issued by a company satisfactory to KCDC, naming KCDC and the City as dual obligees on said performance and payment bonds, and the parties hereby agree that the cost of such performance and payment bonds shall be a line item on the City Improvements Project Budget."

14.     Cityview attempted to secure a performance bond for the work to be performed by Focus (the party contracted to do so under the TIF Agreement to satisfy the bonding obligation). However, due to macro-financial distress and the general downturn in the economy, neither Focus nor Cityview were able to obtain a performance bond satisfying the bond condition. Consequently, Cityview sought a substitute for its Performance Bonds obligation.

15.     In an e-mail dated August 18, 2008, Dave Hill, Senior Director of South Waterfront Development, explained that Cityview could satisfy the bond requirement in one of three ways. All three options required that Cityview sign an agreement obligating itself for the

-3-

Case 3:11-cv-00050   Document 1   Filed 02/01/11   Page 3 of 20   PageID #: 3

performance of the work under the TIF Agreement; however, Cityview was advised by Hill that the surety could take one of three forms: (1) a cashier's check; (2) a performance bond; or (3) an irrevocable letter of credit. A true and correct copy of the e-mail is attached hereto as Exhibit 2.

16. To proceed with a letter of credit, Hill explained that City Engineering would provide copies of the requisite documents and instructions to Cityview. City Engineering would then have to accept the form of Cityview's indemnity agreement assuring the Work's performance as well as the form of the letter of credit.

### C. Letter of Credit In Lieu of Performance Bonds

17. When Cityview elected to satisfy the bond requirement by providing an irrevocable letter of credit, City Engineering provided Cityview with its form Performance and Indemnity Agreement for Cityview to execute. The City explained that City Engineering would "expect the letter of credit and Performance and Indemnity Agreement to adhere to their standard forms, which would be required of any developer." A true and correct copy of the e-mail dated August 21, 2008 is attached hereto as Exhibit 2.

18. Because Cityview was required to adhere to the City's form Performance and Indemnity Agreement, and because the purpose of entering this agreement was to provide a substitute protection for one or more Performance Bonds, Cityview sought to assure in the drafting of the performance and indemnity agreement that any draw upon the letter of credit would be premised upon explicitly circumscribed conditions.

19. Indeed, Cityview anticipated that it was procuring the letter of credit solely to serve as a functional substitute of a performance bond, such that it was to provide indemnification for the proper and timely completion and performance of specified work, as would be defined in the executed performance and indemnity agreement, nothing more and

-4-

nothing less. Accordingly, Cityview sought to make explicit that the letter of credit could only be drawn upon by the occurrence of one or more specified defaults in respect to Cityview's performance of the specified work, and, too, only after any such default with respect to its work was properly noticed, with Cityview then afforded a contractually established period to cure the specified default.

20. Additionally, to protect itself as well as Focus (Cityview's affiliated contractor that would be posting the letter of credit), Cityview negotiated with the City to ensure that the agreed upon performance and indemnity agreement would provide that all TIF funds that the City and KCDC had specifically allocated to cover the cost of the specified work would be applied to proper completion of the work before any of the drawn letter of credit proceeds could or would be applied to satisfy the work's completion.

21. On September 10, 2008, Cityview executed the Performance and Indemnity Agreement ("P&I Agreement"). A true and correct copy of the P&I Agreement is attached hereto as Exhibit 3.

22. At Cityview's request, Focus (as account customer thereunder) obtained the required letter of credit. Focus, a distinct legal entity that shared some common ownership with Cityview, also entered into a contract with Cityview to perform the scope of work ("Work") prescribed in the TIF Agreement and under the P&I Agreement.

23. As required under the P&I Agreement, on September 10, 2008, Georgia Commerce Bank issued its irrevocable Letter of Credit No. 5021 ("Letter of Credit") for an aggregate amount not to exceed $1,115,000. A true and correct copy of the Letter of Credit is attached hereto as Exhibit 4.

24. The amount of the Letter of Credit, importantly, was equal to what the City, KCDC and Cityview had agreed was the sum necessary to complete the specific scope of work to be performed by Cityview for the Project -- $1,115,000 being the precise sum the City had allocated from the Note proceeds to pay Cityview for its performance of the specified Work.

25. As required, the beneficiary of the Letter of Credit was the City.

26. The Letter of Credit was nominal in its verbiage; it simply stated that the credit was "to secure the performance by Applicant of its obligations under that certain performance and indemnity agreement dated as of the date hereof from Applicant for the benefit of the Beneficiary." As such, the Letter of Credit left the conditions for drawing upon it predicated solely upon the criteria set forth in the P&I Agreement and the assertions by the City when drawing the Letter of Credit that based upon some default in the P&I Agreement, the City was entitled to draw thereupon.

27. As Cityview had sought when it negotiated the substitution of the P&I Agreement for its otherwise performance bond posting obligation, the P&I Agreement was limited in terms of indemnity coverage and covered only what was defined as "Work" within the scope of services that Cityview, through its contractor, Focus, was to provide. Specifically, the P&I Agreement "(i) guaranties to the City of Knoxville, Tennessee (the "City") full performance of all grading, construction and drainage work (collectively; the "Work") to be undertaken by the Developer . . . and (ii) indemnifies the City from all losses, claims, expenses, fines and penalties that may be incurred by the City due to Developer's failure to perform pursuant to clause (i)." Exhibit 3, p.1.

28. Further (and consistent with Cityview's expressed desire during the negotiations of the documents to make the conditions for drawing the letter of credit as narrow as possible),

the P&I Agreement provided that a default which would permit a draw on the Letter of Credit, could occur in only one of three enumerated ways. Exhibit 3, p. 2.

29. Specifically, the P&I Agreement provided that the City could draw upon the Letter of Credit if, subject to notices and contractually specified cure periods, (a) the "Work is not completed in accordance with the approved plans to the satisfaction of the Engineering Department; or (b) "the street, rights-of-way and downstream drainage facilities are not restored to the pre-construction condition;" or in any event, (c) the "Work is not completed by December 1, 2009, or within a written extension thereof granted by the Engineering Department and KCDC" Exhibit 3, p.2.

### D. Cityview's Performance Under The TIF Agreement

30. Pursuant to the TIF Agreement, Cityview (through its contractor, Focus) began and was prosecuting the Work as required under the TIF Agreement.

31. As part of its contractual obligations, LH Contractors ("LH") was retained to perform certain stabilization work associated with the Redevelopment Plan.

32. While performing their work, LH encountered insubstantial base soil. As part of LH's duties, they were tasked with removing this inadequate soil and replacing it with "good" soil upon which to build the required improvements.

33. Upon information and belief, LH moved the "bad" soil from the pedestrian walk area and placed it somewhere else on the Property. This unforeseen task cost approximately $233,000.00, which exceeded the budget line item for the contemplated work at the site.

34. Faced with the unforeseen cost for removal and replacement of soil, Cityview, through its contractor Focus, submitted a change order package to the City seeking to increase the amount Cityview would be paid for its work to cover the unanticipated costs for removal and

-7-

replacement of construction grade soil. Specifically, Cityview sought a total of $171,383.58 in reimbursement for unanticipated costs.

35. Cityview had also submitted a draw request to KCDC for Work already performed and for which Cityview, as required, had, as documented to KCDC, already paid its subcontractors, including sums previously paid to LH.

36. KCDC failed to pay Cityview, however, based upon having received notice from LH that it was owed for certain more recent work for which it had not been paid.

37. Apart from whether its change order regarding the additional scope of work required to remove and replace soil on the site was approved by KCDC, Cityview was prepared to pay LH for its most recent work with proceeds it was expecting to receive from its properly documented and submitted draw request. And, importantly, Cityview was also prepared to continue its performance under the TIF Agreement, since completing its performance of the redevelopment work was in Cityview's financial interests in multiple respects.

38. However, when KCDC failed to honor Cityview's draw request, Cityview ceased performance under the TIF Agreement.

39. Had the City not defaulted in the payment of the draw request, Cityview could have, and would have, completed the Project by December 1, 2009 as contemplated by the TIF Agreement and the P&I Agreement, paying all subcontractors including LH what they were owed.

E. **Improper Draw of Letter of Credit**

40. On April 20, 2009, KCDC gave Cityview notice that it was in default of the TIF Agreement. Significantly, that notice of default did not address or even refer to Cityview's failure of its performance with regards to any of the Work in compliance with the P&I

-8-

Agreement. Instead, the default letter was premised solely on the non-payment of LH's invoices. Referencing Cityview's failure to pay LH, the Default Letter stated that "[t]his letter shall serve as notice that an Event of Default under the Development Agreement will have occurred if the invoice referenced in the enclosed Notice of Nonpayment is not paid on or before April 30, 2009." Exhibit 5.

41. In no manner was the April 20, 2009 default notice ("Default Letter") to Cityview premised upon an alleged failure to: (a) complete Work in accordance with the approved plans to the satisfaction of the Engineering department; (b) restore the street, rights-of-way and downstream drainage facilities to the pre-construction condition; or, (c) timely complete the Work -- the only defaults specified in the P&I Agreement upon which the Letter of Credit could be drawn.

42. Indeed, the April 20, 2009 default notice could not have been premised upon an alleged failure of either (b) or (c) above because the time for the performance of these preconditions to a default had not yet arisen. Cityview could not be in default of subsections (b) or (c) until the end date for completion of the Work had arrived -- December 1, 2009. It is wholly irrelevant if the City of KCDC speculated that Cityview might not meet that deadline; until that date arrived and the Work was not complete, Cityview could not, as a matter of contract, be in default of those provisions. The December 1, 2009 deadline was important; it afforded ample time for the completion of the Work consistent with the plans before a default due to lack of timely performance could trigger a call of the Letter of Credit.

43. Shortly after notifying Cityview of a default under the Development Agreement, KCDC terminated Cityview. After terminating Cityview, the City changed its redevelopment design plans and contracted with a new developer to complete the project.

-9-

Case 3:11-cv-00050 Document 1 Filed 02/01/11 Page 9 of 20 PageID #: 9

44. Notwithstanding KCDC's failure to provide notice and a cure period for any alleged default under the P&I Agreement, and without declaring any further default of the P&I Agreement, or issuing any notice thereof, other than as noticed in the April 20, 2009 letter, over three months later, on August 11, 2009, KCDC drew upon the Letter of Credit. A true and correct copy of the Letter of Credit Demand is attached hereto at Exhibit 6.

45. In making the draw on the Letter of Credit, the City's Director of Engineering nonetheless signed a presenting document swearing that the Letter of Credit in its full face amount was "due and owing" by Cityview.

### F. Third Amendment to the TIF Agreement

46. Coincident with executing the P&I Agreement and posting the Letter of Credit, on or about September 10, 2008, Cityview and KCDC had executed a Third Amendment to the TIF Agreement ("Third Amendment"). A true and correct copy of the Third Amendment is attached hereto as Exhibit 7.

47. Among its provisions, the Third Amendment provided that after applying certain of the Note proceeds to purchasing the Property, the total Remaining Proceeds (a defined term in the Third Amendment) were to be available to pay various costs of the Project. The Remaining Proceeds were specified in the Third Amendment at $1,728,579.20. Exhibit 7, § 4(b)(vii). The P&I Agreement specifically referenced these Remaining Proceeds as those which KCDC was to apply and exhaust to cure any default under the P&I Agreement before using any of the proceeds from the draw on the Letter of Credit to effect such cure.

48. The Third Amendment, in addition to substituting the letter of credit requirement for the theretofore performance bond requirement, required that the irrevocable letter of credit be in the precise amount of $1,115,000. Exhibit 7, § 4(i)(i).

49. The amount of the Letter of Credit was not arbitrarily chosen. Rather, the $1,115,000 letter of credit was to equal the budgeted line item for the cost of the Work to be performed by Cityview -- the same amount of the "Remaining Proceeds" which the City had specifically approved and earmarked as the portion thereof reserved for payment of Cityview's Work.

50. More specifically, the City had approved an allocation of all the Remaining Proceeds of $1,728,579.20 for various budget items associated with the Redevelopment Plan. The difference between the total Remaining Proceeds ($1,728,579.20) and the amount of the Letter of Credit ($1,115,000) represented those budget items that were not within the scope of Cityview's duties under the TIF Agreement. Thus, $1,115,000 of the Remaining Proceeds, was clearly earmarked as the amount that was to be paid to Cityview for the Work to be performed through its contractor under the TIF Agreement before any Letter of Credit proceeds could be applied. Simply put, the Letter of Credit proceeds were a backstop for the City and KCDC only to the extent the cost to complete the scope of the Work to be performed by Cityview exceeded the sum of $1,115,000 -- the amount which the City had budgeted and allocated for Cityview's Work.

51. Consistent with the notion that the cost to complete the Work to be performed by Cityview would have to exceed $1,115,000 before any proceeds from the Letter of Credit could be applied, the Third Amendment provided that upon the occurrence of any Event of Default under the TIF Agreement, KCDC was entitled to take over construction and completion of the Project and in so doing, KCDC was to apply up to the $1,115,000 of Remaining Proceeds toward the cost of curing Cityview's Work defaults before applying any of the drawn proceeds of the Letter of Credit for such purposes. Exhibit 7, § 6. Thus, even if Cityview was not completing

-11-

the Project and KCDC took over construction, it too, would be obligated to expend up to all of the $1,115,000 to complete the Work before using any sums from a draw on the Letter of Credit for such purpose.

### G. Drawing The Letter of Credit

52. Since the City drew on the Letter of Credit in August, 2009, Cityview has repeatedly contacted KCDC seeking both the return of the proceeds of the Letter of Credit, and an explanation as to how $1,115,000 of the Remaining Proceeds have been or will be used to cure any Work defaults before applying any of the Letter of Credit proceeds to a cure of the Work for which the Letter of Credit was provided.

53. In resisting the return of the Letter of Credit proceeds, KCDC and the City have taken positions wholly inconsistent with the P&I Agreement. They claim that some or all of the $1,115,000 of Remaining Proceeds, which were specifically earmarked for completion of the Work, can be used to satisfy other project expenses instead of being applied solely to perform or cure any default with respect to the Work that was to be performed by Cityview under the TIF Agreement. KCDC and the City also have illegitimately asserted that because certain portions of the Note proceeds have been applied by BB&T to pay interest on the Note or may be applied by BB&T to reduce part of the principal thereof, there are or will be less actual Remaining Proceeds available to complete the Work, and as such, use of Letter of Credit proceeds will be necessary to complete the Work.

54. By letter dated July 2, 2010 (a copy of which is attached hereto as Exhibit 8), KCDC attempted to explain its position with respect to why it was refusing to release any of the proceeds of the drawn Letter of Credit to Focus or Cityview.

-12-

Case 3:11-cv-00050 Document 1 Filed 02/01/11 Page 12 of 20 PageID #: 12

55. The July 2, 2010 letter stated that the City drew down the entire amount of the Letter of Credit as a result of Cityview's "default under that Certain Performance and Indemnity Agreement."

56. Neither KCDC nor the City has ever provided notice of a default under the P&I Agreement.

57. Neither KCDC nor the City has provided Cityview an opportunity to cure any alleged default under the P&I Agreement.

58. Aside from whether the City had any right to draw upon the Letter of Credit in the first place, and even assuming that it was within its contractual right to do so (when it was not), $1,115,000 -- the amount earmarked for Cityview's Work -- would likely have been sufficient, when and if properly applied and accounted for, to complete the Work that Cityview was contractually obligated to perform. As such, none of the Letter of Credit proceeds are necessary to satisfy and complete Cityview's Work or its obligations to indemnify under the P&I Agreement -- the sole purpose for which the Letter of Credit was posted.

59. KCDC has nonetheless asserted that it intends to apply all the Remaining Proceeds set aside in the TIF financing and most if not all of the drawn $1,115,000 Letter of Credit either to satisfy various redevelopment obligations beyond the scope of the Work Cityview was contractually obligated to perform, or to replenish funds from the Note which, because of BB&T's actions to collect interest from the Note proceeds or to retire part of the principal of the Note, are no longer available. KCDC asserts that the proceeds from the drawn Letter of Credit may be used for these purposes.

60. No provision of the P&I Agreement obligated Cityview to satisfy any of the principal or interest on the $2.8 million that was or might be due under the tax increment

-13-

incentive financing. Indeed, as referenced hereabove, the TIF Agreement between the City and Cityview explicitly provided that that $2.8 million loan's repayment was to be "paid solely out of" tax increment revenues which the City and Knox County committed to KCDC, which in turn, was pledging to secure the loan's repayment.

61. Application of the Letter of Credit proceeds to retire principal or interest on the $2.8 million Note is also totally inconsistent with the clear understanding reached by the parties surrounding the use of a letter of credit facility in lieu of a performance bond; namely, that the Letter of Credit was to assure Cityview's completion of the Work within the $1,115,000 that had been budgeted by the City for such Work, no different than what a performance bond would have been intended to assure. As such, the Letter of Credit proceeds were to be used for no purpose other than to assure the specified Work's proper completion within the amount budgeted.

62. KCDC's misapplication of the Letter of Credit proceeds goes beyond attempting to apply such proceeds to retire or satisfy interest on the $2.8 million Note secured by the TIF. The July 2, 2010 letter indicates that the KCDC intends to apply either Note proceeds or the proceeds of the Letter of Credit to pay for the cost "for improvements to Blount Avenue per the Development Agreement." That portion of the redevelopment, for which a separate and specific portion of the City's budget was earmarked, was work to be performed other than by Cityview; and there is no basis under the P&I Agreement or course of dealing between the parties to use any of the Remaining Proceeds of $1,115,000 earmarked for completing Cityview's Work or any of the Letter of Credit proceeds to pay for the cost of the improvements to Blount Avenue.

63. Similarly, the KCDC maintains that, if necessary, it can apply either a portion of the Note proceeds or a portion of the Letter of Credit proceeds to satisfy the "substantial" cost of

-14-

removing certain substandard soil that LH deposited on one of the parcels owned by the Project's current owner. Denying any liability to the City, KCDC, or the project's current owner resulting from the deposit of the substandard soil, nothing in the P&I Agreement authorizes or permits the use of any of the Letter of Credit proceeds to pay for the cost of removal of the substandard soil.

## COUNT I - DECLARATORY JUDGMENT

64. Cityview and Focus incorporate herein by reference paragraphs 1 through 63 of its Complaint.

65. Without providing notice of, or a cure period for, any defaults under the P&I Agreement, the City drew the entire Letter of Credit.

66. Presently, KCDC exercises dominion and control over the Letter of Credit proceeds.

67. Cityview's rights under the P&I Agreement with respect to KCDC's right to draw the Letter of Credit are unclear and in dispute.

68. Pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, Cityview and Focus are entitled to a speedy declaration regarding its rights and status under the P&I Agreement as well as the obligations of the City and KCDC thereunder.

## COUNT II - BREACH OF CONTRACT
### (Defendant City)

69. Cityview and Focus incorporate herein by reference paragraphs 1 through 68 of its Complaint.

70. The City and Cityview are parties to the P&I Agreement.

71. The City failed to provide Cityview or Focus notice of a default under the P&I Agreement.

-15-

72. The City failed to provide Cityview or Focus an opportunity to cure any alleged default under the P&I Agreement.

73. Notwithstanding the nonoccurrence of the conditions precedent, the City drew on the Letter of Credit.

74. The City's actions constitute breaches of the P&I Agreement.

75. As a direct result of the City's breaches, Focus has been damaged in an amount to be proven at trial.

### COUNT III - CONVERSION
### (Defendant KCDC)

76. Cityview and Focus incorporate herein by reference paragraphs 1 through 75 of its Complaint.

77. Without providing notice of, or a cure period for, any defaults under the P&I Agreement, the City wrongfully drew the entire Letter of Credit.

78. KCDC exercises dominion and control over the Letter of Credit proceeds.

79. KCDC is exercising dominion and control over the proceeds of the Letter of Credit for improper purposes and in contravention of Cityview and Focus' rights.

80. Focus is entitled to recover the fair, reasonable market value, the full face amount, of the Letter of Credit.

81. Focus is entitled to recover damages for the loss of use of the converted Letter of Credit proceeds from the date the Letter of Credit was drawn.

82. In violation of Tenn. Code. Ann. § 39-14-103 Focus has been further damaged by KCDC's conversion of the Letter of Credit proceeds in an amount to be proven at trial.

-16-

Case 3:11-cv-00050   Document 1   Filed 02/01/11   Page 16 of 20   PageID #: 16

## COUNT IV - DECLARATORY JUDGMENT

83. Cityview and Focus incorporate herein by reference paragraphs 1 through 82 of its Complaint.

84. Without providing notice of, or a cure period for, any defaults under the P&I Agreement, the City drew the entire Letter of Credit.

85. Presently, KCDC exercises dominion and control over the Letter of Credit proceeds.

86. Cityview and Focus' rights under the P&I Agreement with respect to the proceeds of the Letter of Credit are unclear and in dispute, and KCDC and the City are advancing interpretations of the City's right to the proceeds of the Letter of Credit under the P&I Agreement which Cityview and Focus believe are contrary to that Agreement and inconsistent with the obligations owed to Cityview by the City and KCDC.

87. Pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, Cityview and Focus are entitled to a speedy declaration regarding its rights and status under the P&I Agreement with respect to the proceeds of the Letter of Credit, and any and all remedies that flow therefrom.

## COUNT V - DECLARATORY JUDGMENT

88. Cityview and Focus incorporate herein by reference paragraphs 1 through 87 of its Complaint.

89. In contraventions of Cityview and Focus' rights, the City failed to honor Cityview's change order request.

90. Had the change order been granted, as required, additional funds in the amount of $171,383.58 would have been available and earmarked to cover the cost of Cityview's Work.

91. Pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, Cityview and Focus therefore seek a speedy declaration that the amount earmarked for Cityview's Work should total the original amount designated as such ($1,115,000) plus the amount of the change order ($171,383.58), or approximately $1,286,383.58.

### COUNT VI - BREACH OF CONTRACT
(Defendant KCDC)

92. Cityview and Focus incorporate herein by reference paragraphs 1 through 91 of its Complaint.

93. Cityview and KCDC are parties to the TIF Agreement and its amendments.

94. Under the terms of the TIF Agreement, as amended by the Third Amendment, the proceeds of the Letter of Credit were to be available solely to cure an Event of Default with respect to the Work Cityview was to perform under the TIF Agreement only after KCDC applied the $1,115,000 to the cost of performing that Work.

95. KCDC has failed and continues to fail to apply the sum of $1,115,000 earmarked to pay for the cost of completing the Work which was within the scope of that which Cityview was to perform.

96. KCDC's actions constitute a breach of the TIF Agreement.

97. Had the City applied the earmarked sum of $1,115,000 properly, there would have been sufficient funds to cover the completion of the Work within the scope of that which Cityview was to perform, therefore, Cityview seeks to recover all the proceeds of the Letter of Credit plus interest, and all other damages resulting from the breach.

98. Focus has been damaged by KCDC's breaches in an amount to be proven at trial.

## COUNT VI- ACCOUNTING
### (Defendant KCDC)

99. Cityview and Focus incorporate herein by reference paragraphs 1 through 98 of its Complaint.

100. Cityview and Focus are entitled to an accounting of the proceeds of the Letter of Credit from and after the drawing date through and including the date of trial.

### **Jury Demand**

101. Cityview and Focus demand a trial by jury as to all issues so triable.

WHEREFORE, Cityview and Focus pray that:

    a. process issue and KCDC and the City be served in the manner required by law;

    b. the Court enter a declaratory judgment regarding Cityview and Focus' rights under the P&I Agreement with respect to the proceeds of the Letter of Credit;

    c. judgment be entered in favor of Focus, and remitted to Georgia Commerce Bank, and against KCDC for damages for breach of contract;

    d. judgment be entered in favor of Focus, and remitted to Georgia Commerce Bank, and against the City for damages for breach of contract;

    e. judgment be entered in favor of Focus, and remitted to Georgia Commerce Bank, and against KCDC for conversion;

    f. Plaintiffs recover their costs of litigation, including reasonable attorneys' fees; and

    g. Plaintiffs have such other and further relief as the Court deems just and proper under the circumstances.

-19-

This 31st day of January, 2011.

/ s/ Suneel C. Gupta
Suneel C. Gupta, Esq.
McKenna Long & Aldridge LLP
TBPR # 025421
*Attorneys for Plaintiff*

303 Peachtree St. Suite 5300
Atlanta, GA 30308
404-527-4500
404-527-4198 (fax)
sgupta@mckennalong.com